# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

JULIE STEEPER,                              :

        **Plaintiff**          :   **CIVIL ACTION NO. 3:12-2111**

        **vs.**                      :         **(JUDGE MANNION)**

CAROLYN W. COLVIN, ACTING     :
COMMISSIONER OF SOCIAL
SECURITY,                                   :

        **Defendant**        :

## MEMORANDUM

## BACKGROUND

The record in this action has been reviewed pursuant to 42 U.S.C. §405(g) to determine whether there is substantial evidence to support the Commissioner's decision denying Plaintiff Julie Steeper's claim for Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§401-433.

Steeper protectively filed her applications for DIB on March 26, 2009. Tr. 16, 161-167, 169 and 183.[1] The application was initially denied by the Bureau of Disability Determination on September 21, 2009. Tr. 80-84. On

---

[1]References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of the Answer on December 19, 2012.

November 13, 2009, Steeper requested a hearing before an administrative law judge ("ALJ"). Tr. 85. Hearings were held before an ALJ on October 27, 2010 and May 10, 2011. Tr. 27-74. Steeper was represented by counsel at the hearings. Id. On May 19, 2011, the ALJ issued a decision denying Steeper's application. Tr. 16-26.

The ALJ, after considering the medical records and the testimony of Steeper and a vocational expert, found that Steeper had the functional ability to engage in unskilled, sedentary employment, and consequently, she was not disabled under the Act. Tr. 21, 51, 65-73 and 231-232.  With respect to the unskilled aspect of the work, the ALJ found that Steeper was limited to (1) understanding, remembering and carrying out simple instructions, (2) making simple work-related decisions and (3) only occasional stress in the form of changes in the usual work routine. Tr. 21. The ALJ also found that Steeper could interact with the public on a frequent basis. Id.

On July 18, 2011, Steeper filed a request for review with the Appeals Council. Tr. 11-12. The Appeals Council on August 23, 2012, concluded that there was no basis upon which to grant Steeper's request for review. Tr. 1-5. Thus, the ALJ's decision stood as the final decision of the Commissioner.

Steeper then filed a complaint in this court on October 23, 2012. Supporting and opposing briefs were submitted and the appeal became ripe for disposition on May 6, 2013, when Steeper elected not to file a reply brief.

Steeper was born on March 17, 1965, and at all times relevant to this matter was considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §404.1516(c).

Steeper, who attended regular education classes during her elementary and secondary schooling, graduated from high school and then attended college for 4 years and obtained a Bachelor of Science degree in English. Tr. 30, 175, 181, 192 and 250.

Steeper's work history covers 20 years and at least 8 different employers. Tr. 170-174 and 204-211. The records of the Social Security Administration reveal that Steeper had earnings in the years 1982 through 1992 and 2000 through 2008. Tr. 170. During the years 1993 to 2000 Steeper lived with her husband in England. Tr. 258. Steeper reported that she worked as a secretary, administrative assistant and receptionist while living in England. Tr. 204. Steeper's annual earnings while living in the United States range from a low of $605.31 in 1982 to a high of $26,007.41 in 2002. Tr. 170.

The vocational expert who testified at the administrative hearings identified Steeper's past relevant work as follows: (1) an administrative assistant described as skilled, light work as customarily performed in the economy but medium work as actually performed by Steeper; (2) a secretary described as skilled, sedentary work; (3) a general clerk described as semiskilled, light work; and (4) a data entry clerk described as semiskilled, sedentary work. Tr. 50.

In the application for DIB Steeper claims that she became disabled on January 3, 2008. Tr. 161 and 176. Steeper at that time was working as an administrative assistant at Susquehanna Bancshares, Inc., located in Lititz, Pennsylvania. Tr. 173 and 204-205. At the administrative hearing Steeper testified that she left that position after she had taken medical leave a few days subsequent to the bank's merger with another company, but treating sources indicate that Steeper had been laid off or lost her job after the merger. Tr. 31-32, 258, 264, 277 and 344.

After Steeper's alleged disability onset date of January 3, 2008, Steeper took care of her mother, who suffered from dementia, until June, 2010, when her mother was moved to a nursing home. Tr. 35 and 190. Steeper provided her with companionship, reminded her to take her

medicines, and paid her bills. Id.  Steeper also had a power of attorney for her mother. Id.  In 2009, Steeper went on a cruise. Tr. 38. At the time of the administrative hearing Steeper lived with her boyfriend, four dogs, two cats and a parrot. Tr. 33-34. She testified that her boyfriend, who was on disability, "[did] everything" around the house, including cooking, cleaning, and feeding the dogs. Tr. 33 and 45. Steeper belonged to a gym where she walked on a treadmill. Tr. 33-34. She utilized the gym once per week. Id. Steeper also visited friends in Baltimore every four months or so and went to buffets two or three times per month. Tr. 44 and 64. She obtained a provisional motorcycle license, went to four or five motorcycle dealerships in October, 2010, with her boyfriend and purchased a motorcycle, although she testified that only her boyfriend operated it. Tr. 61-62.

Although Steeper claims that she has been disabled and unable to work full-time since January 3, 2008,  the record reveals that Steeper applied for and received unemployment compensation benefits during the third and fourth quarters of 2008 and the first quarter of 2009.[2] Tr. 39 and 168.

---

[2]An individual can only collect unemployment compensation if the individual is able and willing to accept work. 43 P.S. §801(d)(1).

Steeper claimed that her disability was the result of both physical and mental impairments but in the present appeal only challenges the decision of the Administrative Law Judge as it relates to her alleged mental impairments. Steeper identified her mental impairments as depression, anxiety and obsessive compulsive disorder. Tr. 176.

For the reasons set forth below, we will affirm the decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin.,  181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. §405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v.

Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an

7

administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[3] (2) has an impairment that is severe or a combination of impairments that is severe,[4] (3) has an impairment or

---

[3] If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

[4] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R.

combination of impairments that meets or equals the requirements of a listed impairment,[5] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[6]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular

─────────────────────

§404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§404.1523 and 404.1545(a)(2).

[5]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. §404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[6]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

and continuing basis. <u>See</u> <u>Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996)</u>. A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. <u>Id</u>; <u>20 C.F.R. §404.1545</u>; <u>Hartranft, 181 F.3d at 359</u> n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review Steeper's medical records but in so doing we will primarily focus on the records as they relate to Steeper's alleged mental health impairments.

On January 8, 2008, Steeper had an appointment with Rajesh K. Nallapati, M.D., at Wellspan Medical Group, Dover Internal Medicine, located in Dover, Pennsylvania. Tr. 319-321. The record of this appointment contains no objective mental status examination findings other than it was noted that Steeper's judgment, orientation and mentation (i.e., reasoning and thinking)

were normal. Tr. 321. Steeper did complain of depression and anxiety and Dr. Nallapati's diagnostic assessment included depression. Tr. 319-320. One of Steeper's current medications was Prozac. Tr. 319.

On January 31, 2008, Steeper had an appointment with Theresa A.V. Donati, M.D., at Dover Internal Medicine. Tr. 316-318. Steeper complained of depression "at times," and panic attacks when driving but denied suicidal ideations and reported that she was tolerating her current medications and wanted to stay on Prozac but wanted "something in addition to that for panic attacks." Tr. 316. The record of this appointment contains no objective mental status examination findings. Tr. 316-318. Dr. Donati noted that Steeper had "been through a lot of stress in the past year, including going through a divorce[,] filing for bankruptcy[,] losing her job and her father's passing away" and prescribed the anti-anxiety medication Xanax. Tr. 316.

On February 5, 2008, Steeper had an appointment with Dr. Donati at which Steeper complained of depression but not anxiety. Tr. 314-315. The primary purpose of the appointment was to complete disability paperwork. Tr. 314. The record of this appointment contains no objective mental status examination findings. Tr. 314-315. Dr. Donati's diagnostic assessment was

that Steeper suffered from anxiety, fatigue and depression and prescribed the drug alprazolam (Xanax). Tr. 314.

On February 29, 2008, Steeper had an appointment with Dr. Nallapati at which Steeper complained of symptoms indicative of an upper respiratory infection. Tr. 311-313.  She also complained of depression but not anxiety. Tr. 312.  The record of this appointment contains no objective mental status examination findings other than it was noted that Steeper's judgment, orientation and mentation were normal. Tr. 313. Steeper was continued on Xanax. Tr.  311.

On October 23 and 30, 2008, Steeper had appointments with Dr. Donati for physical ailments. Tr. 302-310.  On both occasions Steeper denied any psychiatric problems. Tr. 304 and 309.  On October 23rd one of Steeper's current medications was Xanax which was discontinued by Dr. Donati and no other psychotropic medications were prescribed. Tr. 307. The records of these appointments contains no objective mental status examination findings other than on October 30th it was noted that Steeper's judgment, orientation and mentation were normal. Tr. 304.

On February 23, 2009, Steeper had an appointment with Dr. Donati at which Steeper complained of depression and anxiety. Tr. 299-301.

Steeper denied any suicidal ideations and stated that she was tolerating her current medications without side effects. Tr. 299. She stated that she had frequent panic attacks and needed to see a psychiatrist and requested a prescription for Xanax and Ativan.[7] Id. The record of this appointment contains no objective mental status examination findings other than it was stated that Steeper was alert, awake and oriented and she had normal judgment and mentation. Tr. 301. Dr. Donati's diagnostic assessment included anxiety and depression and she prescribed the drug citalopram (Celexa). Tr. 299.

On February 24, 2009, Steeper underwent a psychological evaluation at Wellspan Behavioral Health by a post-doctoral psychology intern. Tr. 282-283. A mental status examination revealed that Steeper's mood was depressed and anxious; her affect was blunted and flat; she was appropriately dressed and her hygiene was appropriate; her thought process was organized and coherent; her speech was pressured; she had no delusions or hallucinations; she was oriented to person, place, situation and time; her immediate and recent memory were impaired; her remote memory

---

[7]Ativan "is in a group of drugs called benzodiazepines" and "is used to treat anxiety disorders." Ativan, Drugs.com, http://www.drugs.com/ativan.html.

was intact; she reported too little sleep and increased appetite; her attention and behavior were within normal limits; she reported decreased energy; she reported suicidal thoughts but no plan, means or previous attempts and no family history of attempting or committing suicide; and her insight and judgment were fair. Tr. 282.  Steeper reported being the victim of verbal, emotional and physical abuse from her boyfriend; that she inflicted verbal, emotional and physical abuse on her boyfriend; and that she was the victim of verbal and emotional abuse from her father. Tr. 283. The psychologist's diagnostic assessment was that Steeper suffered from major depressive disorder, recurrent, moderate, and the psychologist gave Steeper a current Global Assessment of Functioning (GAF) score of 42 and a highest GAF score in the past year of 55.[8] Id. The psychologist recommended a treatment plan of weekly outpatient individual therapy. Id. Under the section of the report of the psychological evaluation entitled "Additional Information" it was stated that Steeper described the suicidal thoughts as "fleeting" and had no

_____

[8]The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id.

plan or means and expressed anxiety over recent medication changes by Dr. Donati. Tr. 288. Steeper was advised to contact Dr. Donati directly about those concerns. Id.

On March 23, 2009, Steeper had an appointment with Warren Titcomb, a therapist[9] at Wellspan Behavioral Health. Tr. 281. An assessment of Steeper's current symptoms and functional impairments was set forth in the report of this appointment. Id. Mr. Titcomb indicated that Steeper had no current symptoms or functional impairments relating to mania/hypomania, impulsive/aggressive/reckless/self-injurious behavior, job/school performance, sleep disturbance, and appetite disturbance; mild current symptoms or functional impairments relating to depression/sadness, psychosis/hallucinations/delusions, medical/physical conditions, energy/motivation, thinking/memory/concentration, and activities of daily living; and moderate current symptoms or functional impairments relating to social and/or family problems, and anxiety. Id. Mr. Titcomb used the diagnostic code for major depressive disorder, recurrent, moderate (296.32) and noted that Steeper remained symptomatic but was making progress. Id.

_____

[9]It was noted that Mr. Titcomb had a Master's degree in counseling and was a licensed professional counselor and a certified addictions counselor.

On March 24, 2009, Steeper had an appointment with Dr. Donati at which Steeper complained of depression and anxiety. Tr. 294-298. The record of this appointment contains no objective mental status examination findings other than it was stated that Steeper was alert, awake and oriented and she had normal judgment and mentation. Tr. 298. Dr. Donati's diagnostic assessment included depression and she prescribed the drug Celexa. Tr. 294 and 296.

On March 27, 2009, Steeper was evaluated by Constance N. Ebong, M.D., a psychiatrist at Wellspan Behavioral Health in York, Pennsylvania. Tr. 258-260 and 280.  Steeper told Dr. Ebong that her primary care physician recently switched her medication from fluoxetine (Prozac) to Celexa with significant benefit. Tr. 258. Steeper reported a lifelong struggle with phobias and multiple stressors. Id.  She told Dr. Ebong that she was a member of the Manhattan Recorder Orchestra and played the tenor recorder but that she was very anxious about an upcoming concert. Id. She also stated that she does creative and graphic writing on the computer and that she was presently taking care of her mother who suffered from Alzheimer's disease. Id. Dr. Ebong noted that Steeper was very distractable, irritable and talkative. Id. Dr. Ebong further stated that Steeper had "a tendency to

catastrophize with somatic complaints" and that Steeper reported that her first panic attack occurred in 1994 and that she has had 5 or 6 of them without going into detail. Tr. 259. Steeper also reported a compulsion to chew into her cheeks and dig into her nose. Id. When reporting on a mental status examination, Dr. Ebong indicated that Steeper had a "[f]ull range affect," "[n]o significant abnormal movements or mannerisms," and rapid and pressured speech with flight of ideas; her thought process was quite detailed and overinclusive; she had no suicidal or homicidal thoughts; she denied hallucinations; she reported compulsive behavior, e.g., chewing her cheeks; and her insight was poor to fair. Tr. 259-260. Dr. Ebong's diagnostic assessment was that Steeper suffered from generalized anxiety disorder with significant obsessive compulsive disorder symptoms, a history of panic disorder and she could not rule out major depressive disorder. Tr. 260. Steeper was given a GAF score of 45. Id. Dr. Ebong recommended that Steeper continue receiving psychotherapy and prescribed propranolol to treat Steeper's anxiety. Id. She also increased Steeper's dosage of Celexa from 40 mg per day to 60 mg per day. Tr. 260 and 296.

On April 23, 2009, Steeper had an appointment with Dr. Donati at which Steeper complained of depression and anxiety. Tr. 291-293. The

record of this appointment contains no objective mental status examination findings other than it was stated that Steeper was alert, awake and oriented and she had normal judgment and mentation. Tr. 293. Dr. Donati's diagnostic assessment did not include depression or anxiety but there were no changes made with respect to Steeper's current medications other than with respect to a physical condition. Tr. 291-292.

On July 15, 2009, Steeper had an appointment with Mr. Titcomb at Wellspan Behavioral Health. Tr. 369.  An assessment of Steeper's current symptoms and functional impairments was set forth in the report of this appointment. Id. Mr. Titcomb indicated that Steeper had no current symptoms or functional impairments relating to psychosis/hallucinations/delusions, job/school performance, sleep disturbance, and appetite disturbance; mild current symptoms or functional impairments relating to depression/sadness, mania/hypomania, impulsive/aggressive/reckless/self-injurious behavior, energy/motivation, thinking/memory/concentration and activities of daily living; and moderate current symptoms or functional impairments relating to medical/physical conditions, social and/or family problems, and anxiety. Id. Mr. Titcomb used the diagnostic code for generalized anxiety (300.02) and noted that Steeper remained symptomatic but was making progress. Id.

On July 23, 2009, Steeper had an appointment with Dr. Donati at which Steeper denied any psychiatric symptoms. Tr. 401. The record of this appointment contains no objective mental status examination findings other than it was stated that Steeper was alert, awake and oriented and she had normal judgment and mentation. Id. Dr. Donati's diagnostic assessment did include depression but there were no changes made with respect to Steeper's current medications. Tr. 399-400.

On August 12, 2009, Steeper had an appointment with Mr. Titcomb at Wellspan Behavioral Health. Tr. 368. An assessment of Steeper's current symptoms and functional impairments was set forth in the report of this appointment. Id. Mr. Titcomb indicated that Steeper had no current symptoms or functional impairments relating to psychosis/hallucinations/delusions, medical/physical conditions, job/school performance, sleep disturbance, and appetite disturbance; mild current symptoms or functional impairments relating to mania/hypomania, impulsive/aggressive/reckless/self-injurious behavior, energy/motivation, thinking/memory/concentration and activities of daily living; and moderate current symptoms or functional impairments relating to depression/sadness, social and/or family problems, and anxiety. Id. Mr. Titcomb used the diagnostic code for generalized anxiety (300.02)

and noted that Steeper remained symptomatic but was making progress. Id.

On September 11, 2009, John Gavazzi, Psy.D., A.B.P.P., a board certified clinical psychologist, reviewed Steeper's medical records on behalf of the Bureau of Disability Determination. Tr. 370-386.  Dr. Gavazzi opined that Steeper suffered from depressive disorder, not otherwise specified, and anxiety disorder, not otherwise specified, but that these disorders did not meet or equal the requirements of a listed impairment. Tr. 376, 378 and 383. He further found that Steeper can perform simple, routine, repetitive work in a stable environment; she can make simple decisions; she can maintain socially appropriate behavior and has adequate impulse control; she is able to interact appropriately with the public; she can function in a production-oriented job requiring little independent decision making; and she retains the ability to manage the mental demands of many types of jobs not requiring complicated tasks. Tr. 372.  Dr. Gavazzi found that Steeper was only moderately limited in her ability to understand, remember and carry out detailed instructions and respond appropriately to changes in the work setting. Tr. 370-371.  Dr. Gavazzi further concluded that Steeper "is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments." Tr. 372.

On December 3, 2009, Steeper had an appointment with Dr. Donati at which Steeper denied any emotional problems. Tr. 397. The record of this appointment contains no objective mental status examination findings other than it was stated that Steeper was alert, awake and oriented and she had normal judgment and mentation. Tr. 398. Dr. Donati's diagnostic assessment did include depression and anxiety but there were no changes made with respect to Steeper's current medications other than with respect to a physical condition. Tr. 395.

On February 12, 2010, Steeper had an appointment with Dr. Ebong at which Steeper reported that Lamictal[10] had helped her mood improve.[11] Tr. 421-422. A mental status examination performed by Dr. Ebong revealed that Steeper's mood was "more or less euthymic;" her speech had a regular rate and rhythm; her thoughts were organized; she denied suicidal or homicidal thoughts; and her insight was fair. Tr. 421. Dr. Ebong's diagnostic assessment was that Steeper suffered from a mood disorder, not otherwise

---

[10]Lamictal "is an anti-epileptic medication" which "is used . . . to treat epileptic seizures in adults and children" but is also used "to delay mood episodes in adults with bipolar disorder[.]" Lamictal, Drugs.com, http://www.drugs.com/lamictal.html.

[11]The record of this appointment indicates that Steeper's last appointment with Dr. Ebong was on November 2, 2009. However, the administrative record does not contain the report of that appointment.

specified, with significant anxiety and obsessive-compulsive traits and a history of panic disorder. Id.  Dr. Ebong did not report a GAF score. Id. Steeper was prescribed medications and advised to continue with mental health therapy. Id.

The next appointment with Dr. Ebong was on August 2, 2010, at which Steeper reported she had lost over 50 pounds as a result of dieting with her boyfriend and that she had been active in therapy which resulted in significant benefit. Tr. 426-427. However, Steeper also reported gustatory hallucinations and worsening depression with psychotic features and compulsions, i.e., picking or digging inside her nose. Tr. 426.  It was stated that Steeper had recently been referred to a dialectical behavioral therapy program. Id. A mental status examination performed by Dr. Ebong revealed that Steeper's affect was mildly anxious; her speech was "in a somewhat ruminated manner;" she reported hallucinations; she denied suicidal and homicidal thoughts; and her insight was fair. Id. Dr. Ebong's diagnostic assessment was that Steeper suffered from major depressive disorder with psychotic features and obsessive compulsive disorder, not otherwise specified.[12] Tr. 435. Dr. Ebong prescribed Geodon, Lamictal and Celexa and

---

[12]The record of this appointment is typewritten but of a very poor quality. Dr. Ebong may have diagnosed Steeper as suffering from an additional mental

advised Steeper to continue therapy. Id.  Dr. Ebong did not report a GAF score. Id.

On January 4, 2011, Steeper was evaluated on one occasion by Anthony J. Fischetto, Ed.D., on behalf of the Bureau of Disability Determination. Tr. 249-257.  A mental status examination performed by Dr. Fischetto revealed that Steeper was neatly dressed and groomed; she was pleasant and cooperative with good eye contact; she had average psychomotor activity; her speech was even paced and average except for being somewhat staccato at times; her affect was somewhat bright; her thought process was productive and spontaneous; her thought continuity was goal-directed with no looseness of association; she had good abstract thinking; she had average intelligence and fund of knowledge; her concentration was a little slow for serial sevens; she was oriented to person, place and time; she had average remote memory, recent past memory and recent memory; her immediate retention and recall was good and she was able to spell "world" forwards and backwards; she was considered to have limited social judgment as the result of the reported delusions and paranoia; she had good test judgment; she had limited insight; her reliability was

_____

health condition.

average; she reported feeling flat and depressed and manic episodes where she would be up for days; she reported panic attacks and sleeping problems; she reported suicidal thoughts before Christmas but no present suicidal thoughts or plan; and she reported impulsive behavior, i.e., picking her nose and biting her cheeks, and perceptual disturbances, including smells and hearing voices. Tr. 251-252.  Dr. Fischetto's diagnostic assessment was that Steeper suffered from schizoaffective disorder, bipolar type; panic disorder without agoraphobia; obsessive compulsive disorder; and borderline personality disorder. Tr. 254.  Dr. Fischetto gave Steeper a GAF score of 49. Id. Dr. Fischetto stated that Steeper had limited social functioning, poor concentration, persistence and pace and merely noted Steeper self-reported limited activities of daily living. Tr. 254-255.

Dr. Fischetto also completed a statement of Steeper's work-related mental functional abilities. Tr. 256-257. Dr. Fischetto opined that Steeper had slight limitations with respect to understanding, remembering and carrying out both short, simple instructions and detailed instructions; she had slight to marked limitations with respect to making judgments on simple, work-related decisions; she had slight limitations with respect to interacting appropriately with the public, supervisors and coworkers; and she had slight to marked

limitations with respect to responding appropriately to work pressures in a usual work setting and changes in a routine work setting. Tr. 256. Dr. Fischetto did not specify when the above limitations arose or whether or not they were expected to last for a continuous period of twelve months or more. Id.

Steeper submitted at the second administrative hearing a checkmark questionnaire regarding depression which was completed by Todd Muneses, M.D., on March 16, 2011. That document indicates that Dr. Muneses first saw Steeper on November 12, 2011. Tr. 247.  Dr. Muneses circled answers to indicate that Steeper had "moderate" restrictions of activities of daily living and "marked" difficulty in maintaining social functioning. Id. Dr. Muneses circled "yes" in response to a statement "[d]eficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner" and circled "present" to indicate Steeper would decompensate in work or work-like settings. Id.  Dr. Muneses further indicated that Steeper was markedly impaired in seven areas of mental work-related functional abilities. Tr. 248. Dr. Muneses did not specify when the above limitations arose or whether or not they were expected to last for a continuous period of twelve months or more. Id. Furthermore, no other

records from Dr. Muneses were submitted to either the ALJ or the Appeals Council by Steeper.

## DISCUSSION

The ALJ went through the five-step sequential evaluation process and found at step five that Steeper was not disabled. The severe mental impairments found at step two were bipolar disorder, depression, anxiety disorder, obsessive compulsive disorder, borderline personality disorder, schizoaffective disorder (bipolar type), and panic disorder. Tr. 18. At step three, the ALJ found that Steeper's mental health impairments did not meet or medically equal the requirements of any listed mental health impairment. Tr. 19-21. With respect to the residual functional capacity the ALJ found that although Steeper could not perform her past relevant work Steeper could perform a limited range of sedentary work. Tr. 21 and 25. Specifically, Steeper could engage in sedentary work as defined in the regulations except with respect to her mental health condition she was limited to simple work-related decisions and understanding, remembering, and carrying out simple instructions, and only occasional stress in the form of changes to the usual work routine. Tr. 21. Steeper was also found to have the ability to have

frequent contact with the public. Id.

In setting this residual functional capacity, the ALJ relied on the opinion of Dr. Gavazzi and rejected the opinion of Dr. Fischetto and Dr. Muneses. Tr. 23. In addition the ALJ found that Steeper's statements about her mental functional limitations were not credible. Tr. 24. Specifically, the ALJ stated in pertinent part as follows:

> The undersigned does not find the claimant entirely credible regarding her allegations related to her mental impairments. . . The claimant has not received inpatient mental health therapy treatment nor has she required partial hospitalization for her mental health impairments. Her thought process was noted to be organized on multiple occasions and coherent. She was noted to have remote memory and intact concentration. Her records also indicate that she does not have persistent hallucinations. She was noted to have only mild impairment with thinking, memory and concentration on multiple occasions. She testified that she has received unemployment compensation benefits (after the alleged onset date). To receive those benefits the claimant must indicate she is ready, willing and able to work. Such an assertion contradicts the claimant's assertion that she is and has been disabled since her alleged onset date.

Id. The ALJ further mentioned Steeper's activities, including her purchasing a motorcycle, going on a cruise and going out in public as a basis to conclude that her claimed limitations regarding social interaction and concentration were not as severe as reported and as a basis to doubt her credibility. Tr. 24-

25.

At step five based on the above residual functional capacity and the testimony of a vocational expert the ALJ found that Steeper could perform work as a surveillance systems monitor and a call out operator, and that there were a significant number of such positions in the local and national economies. Tr. 26.

Steeper claims that the ALJ erred by (1) failing to find that her mental impairments met the requirements of a listed impairment, (2) failing to give controlling weight to the opinion of a treating physician, (3) finding her only partially credible, and (4) finding that although she could not perform her past relevant work she could perform other work. After thorough review of the record in this case, it appears the Commissioner has sustained her burden.

Steeper's first argument is premised on the contention that she met or equaled  the requirements of certain mental health listings. If Steeper's severe impairments met or equaled a listed impairment, she would have been considered disabled per se and awarded disability benefits. However, a claimant has the burden of proving that his or her severe impairment or impairments meet or equal a listed impairment. Sullivan v. Zebley, 493 U.S. 521, 530 (1990); 20 C.F.R. §1520(d) and §416.920(d). To do this a claimant

must show that all of the criteria for a listing are met or equaled. Id. An impairment that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.   Furthermore, the Commissioner's Listings contemplate that findings satisfying the required criteria will be consistently documented over a period of time, not just on isolated examinations. 20 C.F.R., pt. 404, subpt. P, app. 1, §1.00D ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); id. §1.00H(1)("[ ] impairments frequently improve with time or respond to treatment; [t]herefore, a longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment . . . .").

The determination of whether a claimant meets or equals a listing is a medical one. The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. §404.1512(c). Consequently, a claimant must present medical evidence or opinion that his

or her impairment meets or equals a listing.

All of the listings cited by Steeper required that she establish that she was markedly limited in two out of three functional areas  - activities of daily living, social functioning and concentration, persistence or pace - or markedly limited in one of those functional areas and also that she suffered from repeated episodes of decompensation, each of an extended duration.

Although Steeper refers to the records of Dr. Ebong and the opinions of Dr. Fischetto and Dr. Muneses, those records do not indicate that she met the requirements of the mental health listings  with respect to two out of the three above mentioned criteria or one of those criteria and repeated episodes of decompensation. The records clearly do not reveal that Steeper satisfied the required criteria consistently over a period of time.

The record contains a functional assessment from Dr. Gavazzi, a state agency psychologist, who reviewed Steeper's medical records and concluded that Steeper did not meet the requirements of any listed mental health impairment. The administrative law judge's reliance on that opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's

decision was supported by substantial evidence[.]").

No treating physician submitted a functional assessment of Steeper which indicated that she was functionally impaired from a mental standpoint for the requisite continuous 12 month period.[16] Under the circumstances presented, it was clearly appropriate for the ALJ to conclude based on Dr. Gavazzi's opinion that Steeper had the mental functional ability to engage in a limited range of full-time sedentary work.

To the extent that Steeper argues that the administrative law judge did not properly consider her credibility, the administrative law judge was not required to accept Steeper's claims regarding her mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a

---

[16]To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §432(d)(1)(A).

witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Steeper testify, the administrative law judge is the one best suited to assess her credibility.

It appears that the administrative law judge appropriately took into account all of Steeper's mental limitations in the residual functional capacity assessment.

At step five of the sequential evaluation process, the burden of production temporarily shifts to the Commissioner to produce vocational evidence demonstrating that there are a significant number of jobs in the national economy that the claimant, given her residual functional capacity, can perform. Once the Commissioner satisfies this limited burden of production, the burden shifts back to the claimant to prove that the Commissioner cannot rely on the vocational evidence.

Steeper basically argues that the ALJ 's step five determination was a product of legal error because the ALJ when framing a hypothetical

question for the vocational expert did not include all the limitations which she asserts were supported by the medical records. The ALJ was not required to accept the mental limitations asserted by Steeper in framing a hypothetical question and setting the residual functional capacity. Steeper's argument fails for the reasons previously given: the ALJ appropriately relied on the opinion of Dr. Gavazzi.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g) the decision of the Commissioner is affirmed.

An appropriate order will follow.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


Dated: July 30, 2014
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-2111-01.wpd